JUDGE STEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------

08 CV 1033

Keenson Shipping Inc.,

                     Plaintiff,

              v.

Palmyra Shipping and Chartering Ltd.,

                     Defendant.

------------------------------------------------------------------x

08 CIV _____

**VERIFIED COMPLAINT**

JAN 31 2008

U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff Keenson Shipping Inc., ("Keenson"), through its attorneys DLA Piper US LLP,

as and for its Verified Complaint against Defendant Palmyra Shipping and Chartering Ltd.

("Palmyra") avers as follows.

Jurisdiction and Venue

      1.     The Court has admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333

because the action involves a claim for the breach of a maritime contract of charter party.  This is

an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil

Procedure.

      2.     Venue in this district is proper in accordance with 28 U.S.C. § 1391(b)(2).

Right of Action

      3.     Plaintiff Keenson brings this action in accordance with Section 8 of the Federal

Arbitration Act, 9 U.S.C. § 8.

The Parties

4.     At all times relevant hereto, Plaintiff Keenson was and still is a foreign business entity duly organized and existing under the laws of Liberia and with a place of business in a foreign country.

5.     At all times relevant hereto, Defendant Palmyra was and still is a foreign business entity duly organized and existing under the laws of a foreign country.  Defendant Palmyra cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rule B").

The Charter Party and Voyage

6.     On or about June 13, 2007, Plaintiff Keenson, as owner of the M/T Ionian Sea (the "Vessel"), entered into a single voyage charter contract with Defendant Palmyra, as charterer of the Vessel, on an Amended Asbantankvoy form to carry a cargo of about 95,000 mt of fuel oil (the "CP").  (The recap of the fixture of the CP, as well as the Asbantankvoy form, are appended as Exhibit 1.)

7.     On or around June 18, 2007, in accordance with the CP and Palmyra's instructions the Vessel tendered Notice of Readiness at Aliaga, Turkey.  The Vessel commenced loading shortly thereafter and completed loading the oil cargo on June 20, 2007.

8.     The Vessel then sailed as instructed by Palmyra to Rabigh, Saudi Arabia to deliver the oil cargo, where it arrived on June 30, 2007.  The Vessel completed discharge on the afternoon of July 13, 2007.

The Unpaid Demurrage and War Risk Premium

9.     In accordance with the CP, Palmyra had a total of 84 hours of allowable laytime.  Palmyra, however, took a total of approximately 354 hours.  The Vessel was hence on demurrage

for approximately eleven days. As a result, Palmyra owes Keenson approximately $379,783 in demurrage. (Attached as Exhibit 2 is a laytime statement showing the demurrage owed by Palmyra.)

10.     In addition, because Rabigh, Saudia Arabia—the discharge port nominated by Palmyra—was an "excluded area" under Clause 51 of the CP, Keenson had to pay an additional war risk premium to its hull underwriters. Under the CP Keenson is entitled to reimbursement of $7,678 for the additional war risk premium it incurred.

11.     On July 12, 2007 Keenson sent Palmyra an invoice for the owed demurrage and on August 1, 2007 it sent an invoice for the additional war risk premium incurred by it. (Appended as Exhibit 3 are the invoices sent by Keenson to Palmyra.)

12.     Despite repeated requests, Palmyra has failed to pay the demurrage and additional war risk premium due and owing to Keenson.

The Arbitration

13.     Clause 24 of the CP provides that any disputes arising thereunder shall be subject to London arbitration. As a result Keenson has commenced arbitration proceedings in London against Palmyra to recover the amounts due and owing to it by Palmyra. The arbitration is currently ongoing and most recently Palmyra made its claim submission on January 23, 2008.

14.     Keenson estimates that its claims against Palmyra will total approximately $447,461. This amount includes $379,783 for unpaid demurrage, $7,678 for additional war risk premium, and $60,000.00 for interest, costs, and attorney's fees.

15.     The attachment is necessary to secure satisfaction of the award to be issued in Keenson's favor in the London arbitration.

c.    That Plaintiff Keenson have such other, further and different relief as this Court

may deem just and proper in the premises.

Date:   New York, New York
        January 30, 2008

Respectfully submitted,

DLA PIPER US LLP

By: _____
        Stanley McDermott III
        Camilo Cardozo
        1251 Avenue of the Americas
        New York, New York 10020
        Tel: (212) 335-4500
        camilo.cardozo@dlapiper.com

Attorneys for Plaintiff
*Keenson Shipping Inc.*

## ATTORNEY VERIFICATION

State of New York   )
                  )    ss:
County of New York )

CAMILO CARDOZO, being duly sworn, deposes and says as follows:

1.     I am an associate with the law firm of DLA Piper US LLP, attorneys for Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications from Keenson Shipping Inc. ("Keenson") to colleagues in the firm's office in London, and the documents provided by Keenson regarding the claim attached as exhibits to the Complaint.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers is presently within this District.

_____
CAMILO CARDOZO

Sworn to before me this
30th day of January 2008

_____
Notary Public

CHRISTINE B. FARRELLY
Notary Public, State of New York
No. 01FA5037249
Qualified in New York County
Commission Expires December 19, 2010

Exhibit 1

## Choo, Linos

| | |
|---|---|
| **From:** | Mikkel Mathiesen ( TPM Geneva ) [mikkel.mathiesen@tankerpacific.com] |
| **Sent:** | 13 June 2007 16:55 |
| **To:** | Knut Estensen |
| **Cc:** | Vaughan English; Rajeev Ahuja |
| **Subject:** | FW: ionian sea / palmyra -final recap- |

Have concluded below in accordance with your authority.

Mikkel Kjaer Mathiesen
Tanker Pacific Management (Geneva) Ltd.
Tel +41 22 592 6363
Dir +41 22 592 6351
Mob +41 79 592 6565
Email commercial@tanker.com.sg


-----Original Message-----
From: tankers@braemarseascope.com [mailto:tankers@braemarseascope.com]
Posted At: Wednesday, June 13, 2007 11:49 AM
Posted To: (Geneva)tpms.chartering
Conversation: ionian sea / palmyra -final recap-
Subject: ionian sea / palmyra -final recap-



FROM : BRAEMAR SEASCOPE
DATE : 13/06/2007
TIME : 10:49:06
REF  : JPG30526862
Tel: (44) 20 7535 2626, Fax: (44) 20 7535 2627


attn mikkel

f i n a l   r e c a p i t u l a t i o n

re : "ionian sea" / palmyra -cp dated 13/06/2007-

strictly private and confidential

===================================

as per charterers authority we are pleased to recap the flwg fixture
concluded clean with all subjects lifted with c/p dated 13th june 2007

-charterers:-
palmyra shipping and chartering ltd
trust company complex
ajeltake road
ajeltake island


23/01/2008

f.w. "ionian sea" palmyra -final recap-

majuro mh 96960
marshall islands

-owners:-
keenson shipping inc
80, broad street
monrovia
liberia

-m/t "ionian sea"
1992 built
singapore flag
swdt 98,827 mts on draft 14.998m
loa 242.76m
beam 38.0m
ktm 46.88m
tpc 85.14
sbt/heat exchangers/igs/vrs/cow
p+i club lsso - the london steamship owners mutual insurance
          association limted
class abs
h+m value usd 39 mill

-vsl's intake fueloil about 95,000 mts

-tbook vessel is suitable for trade to:-
BHP, BP, Chevron, ExxonMobil and Shell

-last 3 cargoes:-
cracked grade fueloil, coker gasoil
bach ho crude
nile blend

-itinerary:-
open port said 17th jun free of cargo

-for
chopt upto full cargo 1/2 grades fueloil wvns - vsl to maintain
loaded temp 135 deg f - max loaded temp 165 deg f

-loading 1 sp turkish med excl. sea of marmara

-discharging 1 sp saudi red sea not south of but incl. rabigh bay

-laycan 18-20 june 2007

-freight
lumpsum 1,275,000 usd 1/1 incl. suez dues

chopt to top off 1 sts cyprus excl. toc and payable as per
interim/blending/reload clause

-dem 35,000 usd pd/pr

-saudi handling fees to be for owners account

23/01/2008

-84 hours shinc

-------------------------------------------------------------------
palmyra shipping and chartering ltd additional clauses to
"asbatankvoy" charter party (chartering terms effective 15th september
2004) amended as follows:-
-------------------------------------------------------------------

part ii

cl 01  d) 1st line delete "0600" insert "0001"
           delete balance  of d ie charterers amendment
           insert "should it become evident to owners that vessel
           will arrive at load port after expiry of laycan, owners
           to inform charterers and request new suitable laycan.
           charterersshall have the option to cancel the c/p, this
           option to is declarble latest two wroking days after
           receipt of such notice from owners. in the event that no
           such advice is received by owners within 2 working days,
           laycan shall be deemed to be amended in accordance with
           owners request.
       e) line 1/2/3 delete from "line 1 "after" to line 3 "also"
           delete as of "under no circumstances..." till end of para
       f) delete
       g) delete
       h) delete
       i) after "as presented" insert "provided lawful and no
           discrepancy between ship/shore figures and all relevat
           detail duly filled in"
       k) add at the end "provided competitive in line with port
           tariffs"

cl 03  eligibitly clause
           line 1 after "that" insert "to the best of their knowledge"
           line 17 after "resulting" insert "directly"
           line 18 after "all" insert direct

cl 05  lightering / sts clause - delete and insert:
           charterer's option to perform sts operation at a safe place,
           however always subject to owner's/master's approval. any
           transshipment operation to conform to standard not less than
           those set out in the latest edition of ics/ocimf sts guide -
           petroleum with isgott requirements and owner  undertakes that
           the vessel and her crew will comply with such recommendations.

           charterers shall provide and pay for all necessary  equipment,
           including fenders, hoses, anchorage due and agency fees. owners
           shall permit supervisory  personnel nominated by charts to
           attend on board, always at chart's risk and expense, including
           mooring master, to assist in the transshipment operation. all
           time from vessel arrival at sts location until departure from
           sts location to count as full laytime, or as time on demurrage
           if on demurrage, weather and/or sea conditions permitting
           or not. charterers shall not have the benefit of six hours
           notice.
           if required, charterers and or their suppliers shall arrange at
           their expense and time all necessary  ship-to-ship permits and
           licenses which shall be provided to owners  prior commencement

23/01/2008

of ship-to-ship operations.

all port charges, including anchorage dues and agency fee(s) at
any sts/lighterage location to be for charterer's account and
settled directly by them, unless covered in freight by
worldscale charterers shall be responsible for damage to the
vessel resulting form the lighterage operation except in the
case of neglience on the part of the owners (s), master and/or
crew.

cl 06   diversion clause
line 8 insert after "expense" "(including but not limited cost
of bunkers, canal tolls, agents expenses)"
line 9 insert after "charterers" "revised"
line 12 insert after "charter" "and paid along with freight
against masters's statement, owners invoice and copies of
available supporting documents"

cl 07   blending clause and cl 08 discharge reload clause both deleted
insert the following:-

interim/blending/reload clause for lumpsum and ops only
--------------------------------------------------------
base freight is payable basis 1st loadport to final discharge
port. charterers to pay for additional interim load or
discharge port(s) at cost i.e. the difference between actual
steaming time performed and a theoretical direct passage (at
stipulated c/p speed) from first load port to final discharge
port. port time to count in full from arrival pilot station
interim load and/or discharge port(s) until dropping last
outward pilot at interim load and/or discharge port(s), i.e.
no allowance for notice time, nor deduction for shifting even
from anchorage to first berth and no deduction for time lost
due to tide, sea and weather conditions. deviation and port
time used to be calculated at demurrage rate per day or pro
rata plus cost for additional bunkers ifo+mdo consumed at
f.i.f.o. as per master's statement. deviation, port time used,
bunkers consumed and port costs as per agents disbursement
account to be paid together with freight as per owner's
invoice, which later to be supported by hard copy
documentation. time bar provisions of this c/p not to apply to
port expenses incurred at interim load/discharge port(s).
commissions shall be payable on time only.

for both blending clauses master to issue a lop if sample not
placed on board.

discharge/reload
charterers have the option under this clause to call 1 safe
port enroute to final discharge to part discharge, then
reload / blend always for final discharge within range agreed.
such operation, however,shall always be subject to
owners/master's approval which not to be unreasonably
withheld.

1.charterers agree to fully indemnify and hold owners harmless
against all consequences arising as a result of charterers'
request to perform the said cargo operation(s), and for the
issuance of separate set(s) of bill(s) of lading for
parcel(s) loaded.

23/01/2008

2.if tank washing is required, time and cost for washing
and/or deslopping to be for charterers' account. tank
cleaning can only be conducted when vessel is completely
free of cargo.

3.at original loadport one set of all samples (shore,
tank/composite ship samples) to be placed on board before
departure. if any subsequent blending/load on top is carried
out as per charterers'instructions, blended product samples
shall be placed on board before final discharge. any time
lost waiting for such samples to be placed onboard shall be
for chrts' account.

cl 09   ppd clause delete

cl 10   in-transit loss clause
line 2 delete "0.25" insert "0.4"
line 3 delete "deduct" insert "claim"
add at the end "transit loss is defined as the difference
between vessel's temperature adjusted gross volume after
loading and before unloading at the discharging port(s).
unpumpable cargo shall not constitute an actual loss.

cl 11   clean ballast clause
line 5 insert after "any" "direct"
line 6 insert "nonconcurrent" before "deballasting"

cl 12   pumping clause
line 2 insert after "or" "is" and after "maintaining" "an
average"
line 3 delete "manifold" insert "ship's rails"
line 4 after "permit" insert "(excluding while stripping or
crude oil washing)"
line13 insert after "terminal" "provided such signatures
easily available
line14 after "manifold" insert "internal"

cl 13   nor clause
delete and insert "nor tendered when vessel has arrived at
customary anchorage, waiting area or pilot station to be
considered as only one valid"

cl 14   eta clause
line 3 insert after "ports" "as applicable"
line 5 insert after "pors(s)" directly

cl 15   awaiting cargo documents clause
line 2 after "account" "thereafter for charterers account"

cl 16   waiting for orders clause
delete and insert "such waiting to be for maximum 72 hrs, if
vessel is required to deviate to a safe waiting place then
such deviation time and bunkers to for charterers account.

cl 17   adherence to voyage instructions
line 2 insert after "owners" "provided lawful and in
compliance with the charter party"

23/01/2008

FW: ionian sea / palmyra -final recap-
Page 7 of 11

originals bills of lading and owners' undertaking to
return 2/3 originals bills of lading plus owners receipt for
1/3 original bill of lading markings such bills of lading
"voyage accomplished null
and void" or after 36 (thirtysix) months after completion of
discharge, whichever occurs first, provided that no legal
proceedings have been instituted against owners within such 36
(thirtysix) months.

cl 24  canal clause delete n/a

cl 25  compliance clause delte n/a

cl 26  part cargo clause
line 1 delete "option to pro rata (if fixed on a ws basis)
insert "charterers to pay freight at 50% of agreed
freight rate.

cl 28  overage insurance clause delete n/a

cl 29  bunker survey clause
line 4 insert after "time" "and expenses (including cost of
bunkers)"

cl 30  heating clause
line 2 insert "135 degree fahrenheit"
cl 30 delete except 1st para  and insert
in case cargo is loaded at temperature lower than 135 deg f
charterers have the option to order vessel to increase cargo
temperature but upto max 135 deg f.charterers to pay for
bunkers consumed for heat up at cost (owners to provide
documentation if requested)

cl 31  inert gas gauging clause
delete and insert vessel is equpped with closed gauging /
sampling system

cl 33  speed clause
line 1 delete "warrant" insert "advise"
line 2 after "average" insert "laden speed of about 13.5
knots wsnp"

cl 34  derrick clause
delete and insert as per q88

cl 35  delete

cl 36  delete

cl 38  cargo retention clause
line 1 after "any" insert "hydrocarbon"
line 3 delete "deduct from freight" insert "claim from owners"

line 6 after "pumpable" insert "and reachable by vesssels
fixed equipment"
delete as of "if vessel... till of the parties"

23/01/2008

add at the end "and shall be jointly appointed and equally
paid by owners and charterers"

cl 39  hess shifting/deballasting clause
line 1 insert after "shifting" "time and expenses (including
cost of bunkers)"

cl 41  itf clause
line 2 after "any" insert "direct"

cl 43  bimco isps clause (unamended)

cl 44  cleaning clause
line 2 insert after "charterers" "intended cargo of fuel oil"
line 3 after "satisfaction" insert "if charterers inspector is
unsatisfied, an independent inspector shall be jointly
appotinted and paid for by owners and charterers basis 50/50."

cl 45  cow operations clause
line 4 after "charterers" insert "or any relevant authority,
the"

cl 46  weather clause delete and insert
notwithstanding the provision of any other paragraph of this
clause, or any other clause of this charter party to  the
contrary, if vessel loads or discharges at north west
australia, timor sea, kumul, chinese off shore terminals, ras
shukeir, north sea terminals, ravenna, ancona, la nouvelle,
fiumicino, falconara, milazzo, gaeta, scotland, algeria,
morocco, spanish and/or portuguese atlantic ports, and/or if
lightening / lightering / transhipment takes place at any
location and/or if vessel discharges via sea line and/or
terminals not protected by breakwater, any delays due to
weather and/or swell to count as full laytime or, if the
vessel is on demurrage, as full time on demurrage, and any
resultant expenses and  time for unberthing/re-berthing to be
for charterers' account should the master, pilot or any local
authority deem it neccessary to have tugs standing-by,
shift the vessel, or require any other additional equipment or
services to maintain the safety of the vessel and/or
mooring equipment, then any and all additional expenses
incurred to be for chrtrs acct.

cl 47  commission clause
delete "all monies earned" insert
"freight/deadfreight/demurrage"

cl 51  war risk clause
owners shall effect war risks insurance in respect of the hull
and machinery of the vessel  and their other interests
(including, but not limited to, loss of earnings and detention
and their protection and indemnity risks), and the basic
premiums and/or calls therefore shall be for owners' account.

war risks insurance additional premiums, crew war bonus and
insurance, and additional expenses directly incurred as a
result of the vessel entering an excluded area shall be for
charterer's account, net of all discounts or rebates

23/01/2008

FW: ionian sea / palmyra -final recap-

received by owners and provided always that charterers are
given an indication of the expected additional premium as soon
as possible.

the benefit of discounts or rebates on additional premium
received by owners from their war risks insurers, underwriters
or brokers shall be credited to charterers in full.
charterers shall reimburse owners any amounts due under this
clause upon receipt of owners' invoice together with
reasonable supporting documentation including all associated
debit and credit notes (if any).

for the avoidance of doubt any specific "blocking and
trapping", "loss of profit", "loss of hire",  "loss of
freight", or "loss of bunkers" insurance taken out by owners
in respect of the vessel, and any additional premium relating
thereto arising from charterers' trading of the vessel shall
be for owners' account.

cl 52  third party arrest clause
line 3 delete "fault" insert "neglience on part of owner"

cl 54  delete and insert
laytime/demurrage clause
notwithstanding the provision of any other paragraph of this
clause,or any other clause of this charter party to the
contrary,the following time shall  not count as laytime or,
if the vessel is on demurrage, as time on demurrage as per
charter party agreement

a.all time between early arrival nor at load port,and 0600
(local time) on the first day of laydays or all fast of
loading,whichever first occurs, inless charterers grant
approval beforehand.

b.all shifting time from anchorage to first berth or sts
lightering site.

c.all time spent discharging ballast water or slops,unless
concurrent with cargo operations.

d.all time lost waiting custom,immigration clearance and
pratique.

e.all time lost due to improper operation of the insert gas
system.

f.all time for bunker the vessel,taking or discharging ballast
water,discharging slops or vessel generated wastes,
reconfiguring barges in a tow,cleaning vessel
compartments,unless concurrent with cargo operations.

g.all time spent for excess berthing,and expenses for such
soley for vessels purpose

h.all time for delay for non compliance with law and
regulations warranty and insurance compliance.

23/01/2008

owners additonal clauses
============================

-general strike clause
all delays in australia/india/nigeria/france/spain/scandinavia due to
strike or lockout or restraint of labour to count as full laytime or
as demurrage if the vessel is on demurrage.
time shall not count when strike is of vessel's master, officers or
crew.

-c/p administration clause
the charter party terms and conditions are evidenced by the broker's
fixture confirmation recap ('recap'). both owner and charterer have
three working days to makea any corrections to the recap, failing
which the recap will be considered as the binding contract.
there will be no formal written and signed charter party

-taxes/dues clause
taxes and/or dues on cargo and/or freight to be for charterer's
account.

notwithstanding the provision of any other paragraph of this clause,
or any other clause of this charter party to the contrary , no time
bar to apply on claims brought under this clause.

-turkish straits clause
any delay in passing the turkish straits (dardanelles and bosporous)
northbound and southbound in excess of 48 hours accumulated to be for
charterers account and to count at usd 25,000 pdpr plus the cost of
bunkers consumed during such additional time together with any
additional expenses incurred during such period to be for charterers'
account and to be payable against owners invoice with
available supporting documents together with the the freight. owners
to appoint their agents, when passing the turkish straits

notwithstanding anything elsewhere herein contained, in case the
vessel is not able to arrive at loadport by the cancelling date due
to delay in passing turkish straits, charterer's option to cancel
as provided elsewhere herein can not be exercised. owner to notify
charterer of the date and time that they expect the vessel to be
ready to load based on the advisory position given by the traffic
control.

-freight payment
owners to accept charts bank swift confirmation(bank always to be
acceptable to owners) of transfer of funds for commencement of
discharge eitherwise owners have the right to refuse berthing and/or
commencement of discharge. any delay and/or extra expenses thus
incurred shall be for charterers' account.

-2.5 add comm (as per clause 47) plus 1.25 to braemar seascope ltd on
frt/ddfrt/dem

+++
end of recap
+++

23/01/2008

trust you find the above in order and thanks for your support...

brgds
jason gillott
braemar seascope ltd

yahoo id 'jasongillott'
tel   : +44 207 535 2626
mob  : +44 7785 384937
email : tankers@braemarseascope.com

This e-mail and any attachments are strictly confidential and intended for the addressee only.  If you are not the named addressee you must not disclose, copy or use the information contained herein and you should notify the sender as soon as possible.  Any views expressed in this message are those of the individual sender and not of Braemar Seascope Ltd., except where the message states otherwise.  This e-mail and any attachments are believed to be free from viruses but it is your responsibility to carry out all necessary virus checks.  Braemar Seascope Ltd. accepts no liability for any damage caused by any virus transmitted by this e-mail. Please note that replies to this email address are treated as confidential but may be made accessible by, or distributed to, any member of staff within the Braemar Seascope Group.

Registered in England No 1020997 : VAT Registration No 503295565.

23/01/2008

PALMYRA SHIPPING AND CHARTERING LTD
ADDITIONAL CLAUSES TO "ASBATANKVOY" CHARTER PARTY (CHARTERING TERMS
EFFECTIVE 15th SEPTEMBER 2004)

**1 - ASBATANKVOY CHARTER PARTY**

a) LAYTIME   EIGHTY FOUR (84) HOURS SHINC

b) GENERAL AVERAGE/ARBITRATION LONDON, ENGLISH LAW-
YORK / ANTWERP RULES 1974 AS AMENDED 1990 AND 1994 TO
APPLY

c) **PART II CLAUSE 4A** ADD: CHARTERERS HAVE THE OPTION OF
ORDERING THE VESSEL TO A  NAMED PORT FOR ORDERS.

d) **PART II CLAUSE 5** INSERT '0600 LOCAL TIME' ON THE FIRST LINE
AFTER THE WORD 'BEFORE'. INSERT AT THE END OF THE CLAUSE
'IF HOWEVER, CHARTERERS DO NOT EXERCISE SUCH OPTION
AND THE VESSEL ARRIVES AFTER THE CANCELLING DATE
STIPULATED IN PART 1 B., LAYTIME SHALL COMMENCE UPON
THE VESSELS COMMENCED LOADING. CANCELLATION OR
FAILURE TO CANCEL SHALL BE WITHOUT PREJUDICE TO ANY
CLAIM THAT CHARTERER'S MAY HAVE AGAINST THE OWNERS.

e) **PART II CLAUSE 6** AFTER 'HOWEVER' INSERT 'IRRESPECTIVE OF
WHETHER THE BERTH IS AVAILABLE AND REACHABLE ON
ARRIVAL OR NOT'. ALSO ADD AT THE END OF LAST SENTENCE:
"OR DEMURRAGE". ADD AT THE END " IN ANY EVENT
CHARTERERS SHALL HAVE  THE BENEFIT OF SIX HOURS NOTICE
OF READINESS AT ALL PORTS OF LOADING AND DISCHARGE
EVEN THOUGH THE VESSEL MAY BE ON DEMURRAGE. UNDER
NO CIRCUMSTANCES WILL LAYTIME COMMENCE BEFORE 0600
HOURS ON THE FIRST DAY OF THE LAYDAYS UNLESS VESSEL
BERTHED BEFORE THAT TIME " ALSO ADD AT THE END OF LAST
SENTENCE: "OR DEMURRAGE."

f) **PART II CLAUSE 7** ADD IN EACH INSTANCE, AFTER 'USED
LAYTIME' : 'OR TIME ON DEMURRAGE'. LAST SENTENCE, AFTER
'BERTH' INSERT 'AND TIME AWAITING DAYLIGHT, TIDES, TUGS,
PILOT, CUSTOMS, SANITARY IMMIGRATION AND FREE
PRATIQUE'. ADD AT THE END OF LAST SENTENCE: "OR
DEMURRAGE".

g) **PART II CLAUSE 8** AFTER 'STORM' INSERT 'BAD WEATHER, FOG'
ADD AFTER: "... OR PRO-RATA FOR PART OF AND HOUR FOR
DEMURRAGE SO INCURRED" THE FOLLOWING: "AND TO APPLY
WHETHER THE VESSEL IS ON DEMURRAGE OR NOT".
ADD AT THE END : 'THE REDUCTIONS AND EXCEPTIONS
CONTAINED IN THIS CLAUSE TO APPLY WHETHER OR NOT THE
VESSEL IS LOADING OR DISCHARGING BY STS TRANSFER.'

h) **PART II CLAUSE 9** LINE 1 DELETE "REACHABLE ON HER
ARRIVAL"

i) **PART II CLAUSE 20(A)** DELETE "IN THE FORM APPEARING
BELOW" AND SUBSTITUTE "AS PRESENTED". THE PRINTED BILL
OF LADING FORM IS DELETED.

j) **PART II CLAUSE 20 (III)** DELETE '1950' AND INSERT '1974 AS
AMENDED 1990 AND 1994'

k) **PART II CLAUSE 22,** DELETE AND SUBSTITUTE: "OWNERS TO APPOINT AGENTS NOMINATED BY CHARTERERS AT BOTH LOADING AND DISCHARGE PORTS INCLUDING SAMPLING".

2 - **WORLDSCALE CLAUSE:** WORLDSCALE TERMS AND CONDITIONS AS IN EFFECT ON DATE OF THIS CHARTER PARTY TO APPLY.(EXCEPT WHERE LUMPSUM FREIGHT IS USED)

3 - **ELIGIBILITY CLAUSE:** OWNERS WARRANT THAT THE VESSEL IS IN ALL RESPECTS ELIGIBLE AND NOT BLACKLISTED OR PREVENTED FOR ANY REASON WHATSOEVER FOR TRADING TO THE PORTS AND PLACES SPECIFIED WITHIN THIS CHARTER PARTY, AND THAT AT ALL TIMES SHE SHALL COMPLY WITH AND HAVE ON BOARD ALL CERTIFICATES, RECORDS AND OTHER DOCUMENTS REQUIRED FOR SUCH SERVICE AND AS AMENDED BY:
- ARTICLE VII OF THE INTERNATIONAL CONVENTION OF CIVIL LIABILITY, FOR OIL POLLUTION DAMAGES OF 1969 (CLC CERTIFICATE)
- SOLAS SAFETY CONSTRUCTION AND SAFETY EQUIPMENT CERTIFICATE.
- INTERNATIONAL MARITIME ORGANISATION (IMO)
- ISM CERTIFICATE (AS FROM 1ST JULY 1998)
- ISPS CERTIFICATE (AS FROM 1ST JULY 2004)
IN THE EVENT THAT THE VESSEL DOES NOT MEET ANY OF THE ABOVE REQUIREMENTS  CHARTERERS/SUPPLIERS/RECEIVERS MAY REFUSE TO BERTH, DISCHARGE OR CONTINUE TO DISCHARGE WITHOUT PENALTY AND/OR ANY DELAY RESULTING THEREFROM SHALL NOT COUNT AS LAYTIME OR IF THE VESSEL IS ON DEMURRAGE AS TIME ON DEMURRAGE AND OWNERS SHALL INDEMNIFY CHARTERER(S) FOR ANY/ALL DAMAGES OR EXPENSES INCURRED AS A CONSEQUENCE OF ANY SUCH BREACH.

4 - **CAST IRON:** OWNERS WARRANT THAT ALL RISER VALVES AND FITTINGS, OUTBOARD OF THE LAST RIGID SUPPORT TO THE VESSELS DECK, THAT ARE USED IN THE TRANSFER OF CARGO OR BALLAST, WILL BE MADE OF STEEL OR NODULAR IRON AND THAT ONLY ONE STEEL SPACER OR REDUCER WILL BE USED BETWEEN THE VESSELS MANIFOLD AND THE LOADING ARM. THE FIXED RIGID SUPPORT MUST BE DESIGNED TO PREVENT BOTH LATERAL AND VERTICAL MOVEMENT OF THE TRANSFER MANIFOLD. NO HOSES OF ANY SORT WHETHER INBOARD OR OUTBOARD OF THE LAST FIXED RIGID SUPPORT WILL BE USED FOR THE TRANSFER OF CARGO OR BALLAST.

5 - **LIGHTERING/STS CLAUSE:** IF LIGHTERING/STS IS REQUIRED AT ANY DESIGNATED PORT, SAFE PLACE, OR ANCHORAGE, TIME CONSUMED PERFORMING THIS OPERATION, (INCLUDING BACK-LOADING) SHALL COUNT AS LAYTIME OR TIME ON DEMURRAGE IN EITHER EVENT, TIME SHALL COMMENCE SIX (6) HOURS AFTER ANCHORING OR WHENEVER THE LIGHTERING CRAFT IS ALL SECURE ALONGSIDE, WHICHEVER OCCURS FIRST. THE ANCHORAGE, STS OR LIGHTERAGE AREA SHALL NOT BE CONSIDERED AS AN ADDITIONAL PORT OR BERTH. ANY RUNNING TIME FROM SUCH LIGHTERING AREA TO BERTH SHALL NOT COUNT AS LAYTIME OR TIME ON DEMURRAGE.

6 - **DIVERSION CLAUSE:** NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY IN THIS CHARTER PARTY, AND NOTWITHSTANDING WHAT LOADING AND/OR DISCHARGING PORTS HAVE BEEN NOMINATED AND BILLS OF LADING ISSUED, DISCHARGE PORT(S) SHOWN IN THE BILLS OF LADING NOT TO CONSTITUTE A DECLARATION OF DISCHARGE PORT(S), NOR AN EXERCISE OF OPTION. CHARTERER SHALL HAVE THE RIGHT TO CHANGE HIS NOMINATION OF LOADING AND/OR DISCHARGE PORTS IN ACCORDANCE WITH PART I CLAUSES C AND D HEREOF. ANY EXTRA TIME AND EXPENSE INCURRED BY OWNER IN COMPLYING WITH CHARTERER'S ORDERS SHALL BE FOR CHARTERER'S ACCOUNT AND CALCULATED IN ACCORDANCE WITH PART II CLAUSE 4(C) OF THIS CHARTER. FREIGHT SHALL BE PAID ON THE BASIS OF THE VOYAGE ACTUALLY PERFORMED. CHARTERERS SHALL HAVE THE RIGHT TO MAKE AS MANY CHANGES AS THEY SEEM NECESSARY.

7 - **BLENDING CLAUSE :** CHARTERERS SHALL HAVE THE RIGHT TO COMMINGLE/BLEND CARGO IN VESSEL'S TANKS SUBJECT TO SHIP'S SAFETY AND MASTER'S DISCRETION AND

3

MASTER TO EXECUTE THIS OPERATION AS PER CHARTERERS' INSTRUCTIONS. CHARTERER INDEMNIFIES THE OWNER, VESSEL AND MASTER AGAINST LIABILITY FOR ANY CARGO QUALITY CLAIMS THAT MAY ARISE AS A DIRECT RESULT OF THIS ONBOARD BLENDING, INCLUDING CARGO QUALITY CLAIMS FROM A THIRD PARTY.

ANY ADDITIONAL CHARGES THAT RESULT DIRECTLY FROM CHARTERER EXERCISING THIS ONBOARD BLENDING OPTION, INCLUDING DEMURRAGE, PORT CHARGES, EXTRA AGENCY FEES, CONSUMED BUNKERS AT DOCUMENTED REPLACEMENT COSTS, ETC., AND WHICH ARE NOT INCLUDED IN THE FREIGHT AGREED UNDER PART I OF THIS CHARTER PARTY, SHALL BE FOR CHARTERER'S ACCOUNT. CHARTERER WILL SURRENDER TO MASTER ALL ORIGINAL BILLS OF LADING FOR THE UNBLENDED CARGO AND THE MASTER WILL PROVIDE NEW CONSOLIDATED BILLS OF LADING ON COMPLETION OF BLENDING OPERATIONS, WHICH BILLS OF LADING WILL REFLECT THE ACTUAL GRADE THAT HAS BEEN BLENDED BUT IF IT IS NOT POSSIBLE TO GIVE BACK TO MASTER OR OWNERS THE OLD BILLS OF LADING, CHARTERERS WILL GIVE THE OWNERS A LETTER OF INDEMNITY (AS PER OWNER'S WORDING, NO BANK GUARANTEE), VESSEL WILL PROCEED AS ORDERED, DISCHARGE AS INSTRUCTED, AND NEW BILLS OF LADING WILL BE ONLY ISSUED ONCE THE OLD ONES BACK IN OWNER'S HANDS. ALTERNATIVELY THE BLENDING OPERATION TO BE NOTED IN THE EXISTING BILLS OF LADING WITHOUT ANY REISSUANCE OF NEW SET.

8 - **DISCHARGE/RE-LOAD CLAUSE** : CHARTERERS SHALL HAVE THE OPTION TO TOP OFF AND/OR DISCHARGE IN ONE SAFE PORT AND/OR BLEND AND/OR RELOAD PART OR FULL CARGO AT SAME PORT WHICH MAY DIFFER IN QUALITY FROM THE ORIGINAL CARGO LOADED, FOR FURTHER DISCHARGE WITHIN THE AGREED GEOGRAPHICAL RANGES. CHARTERERS SHALL REIMBURSE OWNER FOR ANY ADDITIONAL TIME USED FOR DEVIATION AND IN PORT (EXCEPT FOR DELAYS DUE TO VESSEL'S BREAKDOWN AND/OR FAILURE) AT THE AGREED CHARTER PARTY DEMURRAGE RATE, PORT CHARGES, BUNKERS CONSUMED, CLEANING AND/OR OTHER ADDITIONAL EXPENSES INCURRED IN THE PERFORMANCE OF THIS CLAUSE, LIMITED, HOWEVER, TO EXPENSES WHICH EXCEED THOSE OWNER SHOULD HAVE INCURRED IN THE PERFORMANCE OF THE BASIS VOYAGE. DEVIATION TIME AT SEA SHALL BE CALCULATED BASED ON THE BP WORLDWIDE MARINE DISTANCE TABLES AT THE AGREED MINIMUM CHARTER PARTY SPEED. DISCHARGE / RELOAD PORT(S) OR LOCATION(S) SHALL NOT COUNT AS ADDITIONAL LOAD OR DISCHARGE PORT(S) OR LOCATION(S).

CHARTERER WILL SURRENDER TO MASTER ALL ORIGINAL BILLS OF LADING FOR THE UNBLENDED CARGO AND THE MASTER WILL PROVIDE NEW CONSOLIDATED BILLS OF LADING ON COMPLETION OF BLENDING OPERATIONS, WHICH BILLS OF LADING WILL REFLECT THE ACTUAL GRADE THAT HAS BEEN BLENDED BUT IF IT IS NOT POSSIBLE TO GIVE BACK TO MASTER OR OWNERS THE OLD BILLS OF LADING, CHARTERERS WILL GIVE THE OWNERS A LETTER OF INDEMNITY (AS PER OWNER'S WORDING, NO BANK GUARANTEE), VESSEL WILL PROCEED AS ORDERED, DISCHARGE AS INSTRUCTED, AND NEW BILLS OF LADING WILL BE ONLY ISSUED ONCE THE OLD ONES BACK IN OWNER'S HANDS. ALTERNATIVELY THE BLENDING OPERATION TO BE NOTED IN THE EXISTING BILLS OF LADING WITHOUT ANY REISSUANCE OF NEW SET.

9 - **POUR POINT DEPRESSANT CLAUSE** : CHARTERER'S SHALL HAVE THE OPTION TO PERFORM POUR POINT DEPRESSANT. CHARERER'S OPTION TO CALL LAVRION OR CHIOS OR ANOTHER PORT OR SAFE ANCHORAGE ENROUTE TO DISPORT TO EFFECT CARGO PPD OPERATION, WHICH SHALL BE CARRIED OUT IN ACCORDANCE WITH CHARTERER'S INSPECTOR INSTRUCTIONS.
DEVIATION PLUS TIME PLUS EXPENSES (INCLUDING PORT COSTS, IF ANY) FOR THIS OPERATION TO BE FOR CHARTERER'S ACCOUNT. CHARTERERS HEREBY HOLD OWNERS HARMLESS FROM CLAIM WHICH MAY BE MADE AGAINST THEM FOR CHANGES IN CARGO QUALITY/QUANTITY DUE TO ABOVE OPERATION.

10- **IN TRANSIT LOSS CLAUSE** : OWNERS WILL BE RESPONSIBLE FOR THE FULL AMOUNT OF ANY IN TRANSIT LOSS, IF ANY IN TRANSIT LOSS EXCEEDS 0.25 PERCENT AND CHARTERERS WILL HAVE THE RIGHT TO DEDUCT FROM FREIGHT AN AMOUNT EQUAL TO THE FOB PORT OF LOADING VALUE OF SUCH LOSS PLUS FREIGHT AND INSURANCE DUE WITH RESPECT THERETO.

4

11- **CLEAN BALLAST CLAUSE:** VESSEL TO ARRIVE AT LOAD PORT WITH CLEAN BALLAST. NO FREIGHT ON SLOPS, OR DEADFREIGHT CAUSED BY SLOPS. BALLASTING/DEBALLASTING TIME NOT TO COUNT EVEN IF ON DEMURRAGE UNLESS CONCURRENT WITH LOADING/DISCHARGING OPERATIONS. ANY EXPENSES AND/OR TIME LOST AS A RESULT OF THE VESSEL FAILING TO COMPLETE DEBALLASTING OPERATIONS WITHIN A PERIOD OF 6 HRS SHALL BE BORNE BY THE OWNERS.

12- **PUMPING CLAUSE:** OWNERS WARRANT THAT THE VESSEL IS ABLE TO DISCHARGE THE ENTIRE CARGO WITHIN TWENTY-FOUR HOURS OR CAPABLE OF MAINTAINING A BACKPRESSURE OF 100 P.S.I (7.0 KG/SQ.CM) AT THE MANIFOLD PROVIDING SHORE FACILITIES PERMIT. IN CASE THE VESSEL FAILS TO COMPLY WITH THE ABOVE SAID REQUIREMENT , OWNERS TO PAY FOR ANY OVERTIME EXPENSES, EXPENSES TO CHARTERERS' AND/OR OTHERS' SURVEYORS OR TO RECEIVERS, EXCESS QUAY DUES AND WHARFAGES AND PORT DISBURSEMENTS AT UNIFORM TARIFFS RULING AT EACH PORT OF DISCHARGE AS PER THE ORIGINAL INVOICES PRESENTED. IF SHORE FACILITIES DO NOT PERMIT DISCHARGE WITHIN THE AGREED TIME, THEN MASTER TO ISSUE A LETTER OF PROTEST AND TO HAVE SAME COUNTER-SIGNED BY THE TERMINAL SHOWING MANIFOLD PRESSURE, PUMP ROOM PRESSURE AND RPM ANY INTERNAL STRIPPING AND ANY START/STOP TIME.

IF VESSEL FAIL TO MAINTAIN ITS PUMPING WARRANTIES OR NEED TO BE REPAIRED AND AS A RESULT OF SUCH CAUSES AND EVENTS THE VESSEL LOSES ITS TURN TO BERTH, LAYTIME AND DEMURRAGE SHALL BE SUSPENDED UNTIL REGAINS THE SAME BERTHING POSITION. IF SUCH CAUSES OR EVENTS OCCUR WHILE VESSEL IS IN BERTH, EXTRA EXPENSES THEREBY INCURRED BY CHARTERERS IN CONNECTION WITH THE VESSEL REMAINING AT THE BERTH SHALL BE FOR OWNERS' ACCOUNT AND CHARTERERS SHALL ALSO HAVE THE OPTION TO ORDER THE VESSEL OUT OF BERTH, SO AS TO AVOID DELAY TO OTHER VESSEL WAITING TO USE THE BERTH, WITH THE COST OF UNBERTHING AND REBERTHING FOR THIS PURPOSES TO BE FOR OWNERS' ACCOUNT. TIME LOST IN BETWEEN BERTHING SHALL NOT COUNT AS LAYTIME OR DEMURRAGE.

13- **NOR CLAUSE :** NOR TENDERED WHEN VESSEL IS ANCHORED AT CUSTOMARY ANCHORAGE TO BE CONSIDERED AS ONLY ONE VALID.

14- **ETA CLAUSE :** VESSEL TO GIVE ETA NOTICES IN ACCORDANCE WITH CHARTERER'S VOYAGE INSTRUCTIONS AND AT LEAST 96/72/48/24/12 HOURS PRIOR ARRIVAL AT LOAD AND DISCHARGE PORTS. WHEN SUCH ETA NOTICES ARE NOT GIVEN, ANY DELAY AT EITHER LOAD OR DISCHARGE PORT(S) RESULTING FROM ETA NOTICES NOT BEING SENT TO BE FOR OWNERS' ACCOUNT EVEN IF VSL IS ALREADY ON DEMURRAGE.

15- **AWAITING CARGO DOCUMENTS CLAUSE :** MAXIMUM 3 HOURS TO BE FOR OWNERS ACCOUNT

16- **WAITING FOR ORDERS CLAUSE:** CHARTERERS TO HAVE THE LIBERTY OF INSTRUCTING THE VESSEL TO WAIT FOR ORDERS AT A SAFE PLACE. TIME USED TO COUNT AS USED LAYTIME AND IF ON DEMURRAGE, AS DEMURRAGE.

17- **ADHERENCE TO VOYAGE INSTRUCTIONS:** OWNERS ARE RESPONSIBLE FOR MASTER'S /VESSEL'S NON COMPLIANCE WITH VOYAGE ORDERS GIVEN UNDER THIS CHARTER PARTY AND ANY TIME LOST AS A RESULT OF FAILURE TO COMPLY NOT TO BE FOR CHARTERERS ACCOUNT.

18- **EXXON EARLY LOADING CLAUSE:** IN THE EVENT CHARTERERS AGREE TO LOAD PRIOR TO COMMENCEMENT OF LAYDAYS, ALL SUCH TIME TO BE CREDITED AGAINST ANY TIME VESSEL IS ON DEMURRAGE. FOR PURPOSES OF THIS CLAUSE, TIME TO COUNT WHEN VESSEL IS ALL-FAST AT THE LOADING BERTH.

19- **FREE PRACTIQUE CLAUSE:** IF "FREE PRATIQUE" IS NOT GRANTED PROMPTLY UPON VESSEL ARRIVAL AT LOAD PORT OR DISCHARGE PORT BY ALL PARTIES CONCERNED,

OR BY MEDICAL/SANITARY OFFICER ONLY, OR VIA RADIO/VHF ONLY, MASTER IMMEDIATELY, HOWEVER LATEST WITHIN 2 HRS FROM TENDERING NOR, TO PROTEST IN WRITING BY TLX/CABLE TO PORT AUTHORITIES, AS STATED IN VOYAGE ORDERS, AND OWNERS TO ATTACH SUCH PROTEST TO THEIR DEMURRAGE CLAIM, IF ANY. LAYTIME SHOULD COMMENCE TO COUNT EARLIEST UPON RECEIVING OF OFFICIAL "FREE PRATIQUE", I.E. UPON BERTHING/CLEARING, WHICHEVER LATEST.

20- **EXCESS BERTH OCCUPANCY:** IF AFTER THE DISCONNECTION OF HOSES, THE VESSEL REMAINS AT BERTH EXCLUSIVELY FOR VESSEL'S PURPOSES, OTHER THAN BY REASON OF FORCE MAJEURE, THE OWNER WILL, AT THE TERMINAL'S OPTION, BE RESPONSIBLE FOR ALL DIRECT OR INDIRECT COSTS CHARGED TO CHARTERER BY THE TERMINAL, THE SUPPLIERS, OR THE RECEIVERS OR ALTERNATIVELY SHALL BE REQUIRED TO VACATE THE BERTH IMMEDIATELY UPON TERMINALS REQUEST.

21- **HOSE CONNECTIONS:** IT IS UNDERSTOOD THAT HOSE CONNECTIONS ON BOARD THE VESSEL TO BE MADE BY OWNERS.

22- **CLAIMS CLAUSE:** CHARTERERS SHALL BE DISCHARGED AND RELEASED FROM ALL LIABILITIES IN RESPECT OF CLAIMS OWNERS MAY HAVE UNDER THIS CHARTER PARTY (SUCH AS, BUT NOT LIMITED TO, CLAIMS FOR FREIGHT, DEADFREIGHT, DEMURRAGE, SHIFTING EXPENSES OR PORT EXPENSES AND/OR ANY CHARGES OR EXPENSES UNDER THIS CHARTER PARTY) UNLESS CLAIM HAS BEEN PRESENTED TO CHARTERERS IN WRITING WITH ALL SUPPORTING DOCUMENTS WITHIN NINETY SIXTY (60) (90) DAYS FROM
COMPLETION OF DISCHARGE UNDER THIS CHARTER PARTY. IN ALL CASES OWNERS SHALL PROVIDE RELEVANT SUPPORTING DOCUMENTATION DULY SIGNED BY MASTER AND
SHIPPERS/RECEIVERS RESPECTIVELY (PROVIDED SUCH SIGNATURES EASILY AVAILABLE) OR AGENTS.

WITH RESPECT TO DEMURRAGE CLAIMS, OWNERS SHALL PRESENT ANY SUCH CLAIMS TOGETHER WITH RELEVANT DOCUMENTS SUFFICIENT TO SUPPORT THE CLAIM WHICH SHOULD
INCLUDE, BUT NOT BE LIMITED TO, THE FOLLOWING DOCUMENTATION :
- COMMERCIAL INVOICE
- LAYTIME STATEMENT
- NOTICE OF READINESS
- ALL STATEMENT OF FACT(S) INCLUDING THE TERMINAL STATEMENT OF FACTS PROVIDED AVAILABLE TO OWNERS
/ TIME SHEET DULY SIGNED BY MASTER
- ALL NOTE(S) OF PROTEST ISSUED BY THE VESSEL
- ALL NOTE(S) OF PROTEST RECEIVED BY THE VESSEL
- HOURLY PRESSURE LOG RECORDED AT EACH MANIFOLD COUNTERSIGNED BY TERMINAL (IF SUCH SIGNATURES EASILY AVAILABLE)
- ANY OTHER RELEVANT DOCUMENTATION

OWNERS FURTHER AGREE THAT WITH RESPECT TO ANY CLAIM OR OTHER UNRESOLVED DISPUTE ARISING OUT OF THIS CHARTER OTHER THAN DEMURRAGE CLAIM, UNLESS ARBITRATION OR LITIGATION, AS PER THIS CHARTER IS COMMENCED WITHIN (1) ONE YEAR AFTER COMPLETION OF DISCHARGE OR THE DATE WHEN DISCHARGE SHOULD HAVE COMPLETED, SUCH CLAIM OR OTHER DISPUTE IS WAIVED AND ALL LIABILITY WHICH RESPECT THERETO IS DISCHARGED.

THIS CLAUSE DOES NOT APPLY TO CLAIMS FOR DAMAGE, LOSS OR SHORT DELIVERY OF CARGO.

23- **BILL OF LADING CLAUSE:** BILLS OF LADING TO BE MARKED "CLEAN ON BOARD" IF REQUIRED BY CHARTERERS. DISCHARGE PORT SHOWN IN THE BILL OF LADING NOT TO CONSTITUTE A DECLARATION OF DISCHARGE PORT AND CHARTERERS TO HAVE RIGHT TO ORDER VESSEL TO ANY PORT WITHIN TERMS OF THE CHARTER PARTY. CHARTERERS WILL ISSUE L.O.I AS PER OWNER'S P AND I WORDING TO INDEMNIFY OWNERS AGAINST CLAIMS BROUGHT BY HOLDERS OF BILLS OF LADING AGAINST

OWNERS BY REASON OF CHANGE OF DESTINATION.
OWNERS AGREE TO INSTRUCT THE MASTER TO DISCHARGE THE CARGO AGAINST A 1/3
ORIGINAL BILL OF LADING. IF SUCH BILL OF LADING HAS BEEN PLACED ON BOARD
THE VESSEL AT LOAD PORT, MASTER SHALL SIGN RECEIPT FOR SAME AND RELEASE IT
TO RECEIVERS VIA APPOINTED AGENTS AT DISCHARGE PORT. IF NO SUCH ORIGINAL
BILL OF LADING IS AVAILABLE AT DISCHARGE PORT, THEN OWNERS TO PERMIT
DISCHARGE AGAINST OWNERS' P AND I CLUB WORDING AND SUCH LETTER TO BE
SIGNED BY CHARTERERS. P AND I CLUB WORDING IS TO INCLUDE CLAUSE
CANCELLING THE LOI AGAINST PRESENTATION EITHER OF 1/3 ORIGINAL BILL OF
LADING OR OF 3/3 ORIGINALS BILLS OF LADING AND OWNERS' UNDERTAKING TO
RETURN 2/3 ORIGINALS BILLS OF LADING PLUS OWNERS RECEIPT FOR 1/3 ORIGINAL
BILL OF LADING MARKING SUCH BILL OF LADING "VOYAGE ACCOMPLISHED NULL
AND VOID" OR AFTER 13 (THIRTEEN) MONTHS AFTER COMPLETION OF DISCHARGE,
WHICHEVER OCCURS FIRST, PROVIDED THAT NO LEGAL PROCEEDINGS HAVE BEEN
INSTITUTED AGAINST OWNERS WITHIN SUCH 13 (THIRTEEN) MONTHS.

24- **CANAL CLAUSE:** PANAMA AND SUEZ CANAL DIFFERENTIALS TO BE PAID BASIS
NEGOTIATED LUMP SUM (WHEN/WHERE APPLICABLE)

25- **COMPLIANCE CLAUSE:** WHERE APPLICABLE OWNERS TO COMPLY WITH:
- TRADING TO THE UNITED STATES OF AMERICA UNITED STATES OIL POLLUTION ACT
  OF 1990 (OPA-90) OWNERS WARRANT THAT
  A) THAT THEY AND/OR THE VESSEL OPERATOR HAS SUBMITTED TO THE UNITED
     STATES COAST GUARD FOR APPROVAL A RESPONSE PLAN FOR THE VESSEL (VRP)
     WHICH MEETS IN FULL THE REQUIREMENTS OF THE UNITED STATES POLLUTION
     ACT OF 1990 (OPA '90), THE USGC NAVIGATION AND VESSEL INSPECTION
     CIRCULAR NUMBER 8 OF 1992 (NAVIC 8-92) AND WITH ANY SUBSEQUENT RULES
     AND / OR REGULATIONS THAT AMEND THE REQUIREMENTS OF NAVIC 8 92, THE
     GOVERNMENT REGULATIONS ISSUED THEREUNDER AND ANY CHANGE, RULE OR
     REGULATION OF, OR SUPPLEMENTARY TO, SUCH CIRCULAR (COLLECTIVELY 'VRP
     REQUIREMENTS)
  B) THAT THE VRP IS APPROVED AND THE VESSEL IS OPERATED IN COMPLIANCE
     THEREWITH, WHEN AND AS REQUIRED BY THE VRP REQUIREMENTS.
  C) THAT THE OWNER OR OPERATOR OF THE VESSEL AND THE VESSEL FULLY MEETS
     ALL OTHER REQUIREMENTS OF OPA AND ANY GOVERNMENT REGULATIONS OR
     GUIDELINES ISSUED THEREUNDER.
  THIS CLAUSE DOES NOT IN ANY WAY LESSEN THE OVERALL EFFECT OR RELIEVE THE
  OWNERS OF ANY STATE OBLIGATIONS IN RESPECT OF VESSEL RESPONSE PLANS OR
  OTHER POLLUTION REQUIREMENTS.
- F.M.C./U.S.C.G. CERTIFICATE OF FINANCIAL RESPONSIBILITY
- U.S. COASTGUARD COMPLIANCE WHEREBY OWNER WARRANTS DURING THE TERM
  OF THIS CHARTER THE VESSEL WILL FULLY COMPLY, AND IF NOT IN COMPLIANCE
  WILL HOLD THE NECESSARY WAIVERS, WITH A ALL APPLICABLE UNITED STATES
  COAST GUARD REGULATIONS NOW IN EFFECT INCLUDING, BUT NOT LIMITED, TO,
  POLLUTION AND SAFETY REGULATIONS OF THE CODE OF FEDERAL REGULATIONS, AS
  AMENDED AND ALL OTHER APPLICABLE STATE POLLUTION AND SAFETY LAWS,
  RULES AND REGULATIONS AS MAY BE PROMULGATED AND SUBSEQUENT
  AMENDMENT THERETO.
- U.S. CUSTOMS REGULATIONS (SCAC CODE) WHEREBY OWNERS WARRANTS THAT IN
  ACCORDANCE WITH THE U.S. CUSTOMS REGULATIONS 19 CFR, SECTION 4.7A AND
  178.2, AS AMENDED, THEY HAVE STANDARD CARRIER ALPHA CODE (SCAC) WHICH
  WILL PREFIX A BILL OF LADING SERIAL NUMBER AND FORM 'A' 'UNIQUE IDENTIFIER'
  TO BE ENTERED ON ALL BILLS OF LADING, CARGO MANIFEST, CARGO DECLARATIONS
  AND OTHER CARGO DOCUMENTS ISSUED UNDER THIS CHARTER PARTY RELATING TO
  THE CARRIAGE OF GOODS TO THE UNITED STATES, CHARTERER IS NOT RESPONSIBLE
  FOR ANY LOSSES OR DELAYS RESULTING FROM OWNERS FAILURE TO COMPLY WITH
  THE FOREGOING.

THE VESSEL IS TO HAVE VALID CERTIFICATE(S) ON BOARD COMPLYING WITH THE
ABOVE REGULATIONS AT ALL TIMES DURING THE CURRENCY OF THIS CHARTER
PARTY.
OWNER TO INDEMNIFY CHARTERER OF ANY PENALTIES, COSTS OR CONSEQUENCES

RESULTING FROM VESSELS NON-COMPLIANCE AND ANY SUCH DELAYS SHALL NOT COUNT AS USED LAYTIME OR TIME ON DEMURRAGE IF VESSEL IS ON DEMURRAGE.

26- **PART CARGO CLAUSE:** FOR ANY CARGO LOADED IN EXCESS OF THE MINIMUM AGREED CHARTERERS OPTION TO PRO RATA (IF FIXED ON A WORLDSCALE BASIS)

27- **SAMPLING CLAUSE:** CHARTERERS SHALL BE AT LIBERTY TO ORDER THE VESSEL TO CALL AT A PORT EN ROUTE OR APPROXIMATELY EN ROUTE FROM LOAD PORT TO DISCHARGE PORT(S) FOR SAMPLING PURPOSES. CHARTERERS SHALL THEN PAY ALL EXPENSES AND ALL PORT DISBURSEMENTS WHERE APPLICABLE (EXCEPT FOR EVENTUAL SHIP/CREW SUPPLIES AND EXPENSES) AND ALL TIME LOST TO COUNT AS USED LAYTIME OR TIME ON DEMURRAGE, IF VESSEL IS ON DEMURRAGE. CHARTERERS WILL MAKE ACCORDINGLY DIRECT ARRANGEMENTS WITH THEIR AGENTS WHO SHALL HANDLE SHIP'S CALL. ANY ADDITIONAL COSTS DUE TO THE VESSEL CALLING FOR SAMPLING PURPOSES TO BE CALCULATED ACCORDING TO PART II, CLAUSE 4 C, OF THIS CHARTER.

28- **OVER AGE INSURANCE CLAUSE:** ANY ADDITIONAL INSURANCE ON CARGO DUE TO VESSEL'S AGE, FLAG AND/OR CONDITION, TO BE FOR OWNERS' ACCOUNT, WHICH MAY BE DEDUCTED FROM THE FREIGHT PAYMENT.

29- **BUNKER SURVEY CLAUSE:** OWNERS ALLOW, IF REQUESTED, CHARTERERS' INDEPENDENT INSPECTORS TO SURVEY BUNKERS ON VESSEL AT LOADING AND DISCHARGING PORT(S), AS WELL AT EVENTUAL INTERIM PORT(S) OF CALL, WITH EXTRA TIME, IF ANY, TO COUNT AS LAYTIME.

30- **HEATING CLAUSE:** THE OWNERS WARRANT THAT THE VESSEL IS FULLY COILED AND UNDERTAKES TO MAINTAIN CARGO AT LOADED TEMP, BUT MAX 135F, THROUGHOUT VOYAGE AND DISCHARGE. ONWERS FURTHER WARRANT THAT THE VESSEL IS CAPABLE OF HEATING THE CARGO TO SUCH TEMPERATURE AS AGREED TO IN CHARTER FIXTURE BETWEEN OWNERS AND CHARTERERS BY ABOUT 3 DEG C PER DAY, AND SUCH TEMPERATURE IS TO BE MAINTAINED THROUGHOUT THE ENTIRE DISCHARGE. SHOULD CHARTERERS REQUIRE VESSEL TO HEAT-UP AS ABOVE THEY WILL REIMBURSE ONWERS USD 2'000 FOR EACH 3 DEG C OF CARGO INCREASED TEMPERATURE. IF THE VESSEL FAILS TO MAINTAIN THE TEMPERATURE REQUIRED, OWNER SHALL BE RESPONSIBLE FOR ANY RESULTING DELAYS AND ALL TIME LOST. FURTHER, CHARTERERS SHALL HAVE THE RIGHT TO ORDER VESSEL TO BE WITHDRAWN FROM BERTH AND ALL TIME AND EXPENSES INCURRED SHALL BE FOR OWNERS' ACCOUNT.

31- **INERT GAS GAUGING CLAUSE:** IF THE VESSEL IS EQUIPPED WITH AN INERT GAS SYSTEM AND THE CARGO COMPARTMENTS ARE INERTED, CHARTERERS OR INDEPENDENT INSPECTORS SHALL HAVE THE RIGHT TO REQUEST THE MASTER TO DEPRESSURIZE FOR THE PURPOSE OF SAMPLING, GAUGING, TEMPERATURE DETERMINATION AND OR DETERMINATION OF THE QUANTITY REMAINING ON BOARD AFTER DISCHARGE.
DEPRESSURIZATION IS TO BE CONDUCTED SAFELY IN ACCORDANCE WITH THE PROVISIONS OF THE INTERNATIONAL SAFETY GUIDE FOR OIL TANKERS AND TERMINALS (ISGOTT) AS ISSUED BY THE INTERNATIONAL CHAMBER OF COMMERCE (ICC) AND THE OIL COMPANIES INTERNATIONAL MARINE FORUM (OCIMF).

32- **P AND I CLUB CLAUSE:** OWNERS WARRANT THAT THE VESSEL IS ENTERED WITH A P AND I CLUB OF GOOD STANDING, MEMBER OF THE INTERNATIONAL GROUP OF P&I CLUBS AND WILL REMAIN SO THROUGHOUT THE COURSE OF THE CHARTER.

33- **SPEED CLAUSE:** OWNERS WARRANT THAT THE VESSEL WILL PERFORM THIS VOYAGE AT AN AVERAGE SPEED OF 13 KNOTS WEATHER AND SAFE NAVIGATION PERMITTING.

34- **DERRICKS CLAUSE:** VESSEL IS FITTED WITH DERRICKS CAPABLE OF LIFTING AND SUPPORTING AT THE VESSEL'S PORT AND STARBOARD MANIFOLDS HEAVY SUBMARINE HOSES OF UP TO ......... METRIC TONS IN WEIGHT.

35- **STERN DISCHARGE CLAUSE:** VESSEL S FITTED WITH A WORKING STERN DISCHARGE SYSTEM.

36- **DYING CLAUSE:** CHARTERERS HAVE THE OPTION TO LOAD A DYED CARGO ON THE VESSEL PROVIDED DYE IS ONE WHICH IS CUSTOMARILY USED OR MANUFACTURED FOR USE IN SAID CARGO. CHARTERERS SHALL ALSO HAVE THE OPTION TO DYE THE CARGO ON BOARD OF THE VESSEL PROVIDED THIS IS CARRIED OUT OR SUPERVISED BY CHARTERER'S PERSONNEL, OR CARRIED OUT BY VESSEL'S PERSONNEL. SUCH OPERATION TO BE AT CHARTERER'S COST, AND ANY DELAY CAUSE BY DYEING SAID CARGO TO BE FOR CHARTERER'S ACCOUNT.

37- **DRUG AND ALCOHOL CLAUSE:** OWNERS WARRANT THAT IT HAS AN EXXON DRUG AND ALCOHOL POLICY OR A POLICY OF DRUG AND ALCOHOL ABUSE ("POLICY") APPLICABLE TO THE VESSEL WHICH MEETS OR EXCEEDS THE STANDARDS IN THE OCIMF GUIDELINES FOR THE CONTROL OF DRUGS AND ALCOHOL ON BOARD SHIP. OWNER FURTHER WARRANTS THAT THIS POLICY WILL REMAIN IN EFFECT DURING THE TERM OF THIS CHARTER AND THAT OWNERS SHALL EXERCISE DUE DILIGENCE TO ENSURE THAT THE POLICY IS COMPLIED WITH.

38- **CARGO RETENTION CLAUSE:** IN THE EVENT THAT ANY CARGO REMAINS ON BOARD UPON COMPLETION OF DISCHARGE. CHARTERER SHALL HAVE THE RIGHT TO DEDUCT FROM FREIGHT AN AMOUNT EQUAL TO THE FOB PORT LOADING VALUE OF SUCH CARGO PLUS FREIGHT DUE WITH RESPECT THERETO, PROVIDED THAT THE VOLUME OF CARGO REMAINING ON BOARD IS LIQUID AND PUMPABLE AS DETERMINED BY AN INDEPENDENT SURVEYOR. ANY ACTION OR LACK OF ACTION IN ACCORDANCE WITH THIS PROVISION SHALL BE WITHOUT PREJUDICE TO ANY RIGHTS OR OBLIGATIONS OF THE PARTIES.
IF THE VESSEL IS EX LAY-UP, DRY DOCK OR EX DRY CARGO, A VALUE OF CARGO AS WELL AS FREIGHT AND INSURANCE FOR ANY SHORT OUTTURN CARGO QUANTITY (AS DETERMINED BY COMPARING THE BILL OF LADING QUANTITY VERSUS THE DISCHARGED QUANTITY BASIS SHORE TANK GAUGES), SHALL BE DEDUCTED FROM FREIGHT TO THE EXTENT THAT SUCH QUANTITY EXCEEDS 0.3 PERCENT OF THE BILL OF LADING QUANTITY.
ANY ACTION OR LACK OF ACTION IN ACCORDANCE WITH THIS PROVISION SHALL BE WITHOUT PREJUDICE TO ANY OTHER RIGHTS OR OBLIGATIONS OF THE PARTIES. FOR THE PURPOSES OF THIS CLAUSE ANY SURVEYOR WHO IS ISO 9002 CERTIFIED SHALL BE CONSIDERED AS ACCEPTABLE TO BOTH CHARTERER AND OWNER.

39- **HESS SHIFTING/DEBALLASTING CLAUSE:** IF MORE THAN ONE BERTH AT LOAD OR DISCHARGE PORT IS USED, SHIFTING EXPENSES TO BE FOR CHARTERERS ACCOUNT, EXCEPT THAT SHIFTING EXPENSES FROM ANCHORAGE TO FIRST BERTH WILL NOT BE FOR CHARTERERS ACCOUNT.

40- **ADDITIONAL OIL POLLUTION INSURANCE CLAUSE:** OWNERS WARRANT THAT THEY HAVE AND WILL MAINTAIN THROUGHOUT THE PERIOD OF THIS CHARTER.
A) THE STANDARD OIL POLLUTION INSURANCE COVER (CURRENTLY USD 1 BILLION) AVAILABLE FROM THEIR P AND I CLUBS, AND
B) ANY ADDITIONAL OIL POLLUTION INSURANCE COVER WHICH BECOMES AVAILABLE VIA THEIR P AND I CLUB OR THROUGH UNDERWRITER PROVIDING FIRST CLASS SECURITY.

IF REQUESTED BY CHARTERERS OWNERS TO PROVIDE CHARTERERS WITH EVIDENCE OF COVER

41- **I.T.F.CLAUSES:** OWNERS WARRANT THAT THE VESSEL/CREW WILL REMAIN IN COMPLIANCE WITH THE REQUIREMENTS OF I.T.F. OR EQUIVALENT DURING THE CURRENCY OF THIS CHARTER PARTY. ANY DELAY AND/OR EXPENSE RESULTING FROM NON-COMPLIANCE WITH THIS WARRANTY SHALL BE FOR OWNERS ACCOUNT AND TIME NOT TO COUNT AS LAYTIME OR DEMURRAGE.

42- **ISM (INTERNATIONAL SAFETY MANAGEMENT) CLAUSE :** OWNERS WARRANTS THAT A 'SAFETY MANAGEMENT SYSTEM' (SMS) IN ACCORDANCE WITH THE ISM CODE WILL BE IN OPERATION THROUGHOUT THE DURATION OF THIS CHARTER. IT IS A CONDITION OF THIS CHARTER PARTY THAT ON AND AFTER JULY 1998 THE OWNER(S) OR THE COMPANY' (AS DEFINED BY THE ISM CODE) SHALL HAVE A VALID 'DOCUMENT OF COMPLIANCE' (DOC) AND THE VESSEL SHALL HAVE A VALID 'SAFETY MANAGEMENT CERTIFICATE' (SMC). UPON REQUEST THE OWNER(S) SHALL PROVIDE A TRUE COPY OF THE RELEVANT DOC AND SMS TO THE CHARTER.

45- **ISPS CLAUSE :** FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) IN RELATION TO THE VESSEL, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND 'THE COMPANY' (AS DEFINED BY THE ISPS CODE) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE RELATING TO THE VESSEL AND 'THE COMPANY'. UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE CHARTERERS. THE OWNERS SHALL PROVIDE THE CHARTERERS WITH THE FULL STYLE CONTACT DETAILS OF THE COMPANY SECURITY OFFICER (CSO).

LOSS, DAMAGE, EXPENSE OR DELAY WHATSOEVER CAUSED BY FAILURE ON THE PART OF THE OWNERS OR 'THE COMPANY' TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR THIS CLAUSE SHALL BE FOR THE OWNER'S ACCOUNT.

44- **CLEANING:** OWNERS WARRANT THAT VESSEL'S LINES/PUMPS, TANKS AND PUMPS SHALL BE IN ALL WAYS SUITABLE FOR LOADING CHARTERERS CARGO TO CHARTERER'S INSPECTOR'S SATISFACTION. IF VESSEL IS FOUND TO BE UNSUITABLE, SHE WILL BE CLEANED UNTIL APPROVAL IS OBTAINED FROM CHARTERER'S INSPECTOR. ANY DELAYS AND COSTS AS A RESULT OF VESSEL ARRIVING AT LOADING PORT AND NOT BEING TO CHARTERER'S SATISFACTION SHALL BE FOR OWNERS ACCOUNT. IF FURTHER CLEANING IS NECESSARY, AND IF 36 HOURS AFTER FIRST INSPECTION BY CHARTERER'S INSPECTOR
THE VESSEL IS STILL UNSUITABLE, CHARTERER SHALL HAVE THE OPTION TO CANCEL THE CHARTER PARTY.
CANCELLATION OR FAILURE TO CANCEL SHALL BE WITHOUT PREJUDICE TO ANY CLAIMS FOR DAMAGES CHARTERER MAY HAVE AGAINST THE OWNER.

45- **COW OPERATIONS CLAUSE:** OWNERS WARRANT THAT THE VESSEL IS EQUIPPED WITH A CRUDE OIL WASHING SYSTEM IN GOOD WORKING ORDER AND THAT THE MASTER, OFFICERS AND CREW ARE COMPETENT TO OPERATE SAID SYSTEM. IF REQUESTED BY CHARTERERS VESSEL SHALL PERFORM COW IN ACCORDANCE WITH THE PROCEDURES DESCRIBED IN THE ISC/OCIMF, IN ALL CARGO TANKS AT DISCHARGING PORT(S) SIMULTANEOUSLY WITH CARGO DISCHARGING OPERATIONS. ANY ADDITIONAL TIME SPENT BY REASON OF COW SHALL COUNT AS USED LAYTIME UP TO MAXIMUM 8 HOURS OWNERS WARRANT THAT OFFICERS AND CREW ARE EXPERIENCED IN COW OPERATION.
EXPENSES FOR COW IF ANY, TO BE FOR OWNER'S ACCOUNT.

46- **CONOCO WEATHER CLAUSE:** DELAYS IN BERTHING FOR LOADING OR DISCHARGING AND ANY DELAY AFTER BERTHING, WHICH ARE DUE TO WEATHER CONDITIONS SHALL COUNT AS ONE HALF LAYTIME OR, IF ANY DEMURRAGE, AT ONE HALF DEMURRAGE RATE.

47- **COMMISSION:** 2.50% ADDRESS COMMISSION TO PALMYRA SHIPPING & CHARTERING. LTD ON ALL MONIES EARNED (DEDUCTABLE AT SOURCE).

48- **P AND C CLAUSE:** NEGOTIATIONS AND FIXTURE TO REMAIN STRICTLY PRIVATE AND CONFIDENTIAL..

49- **SEACOCK VALVES:** SEACOCK VALVES TO BE SEALED AT LOADING PORT BEFORE COMMENCING LOADING IN PRESENCE OF CHARTERERS' REPRESENTATIVE AND SEAL NOT BE BROKEN UNTIL COMPLETION OF DISCHARGE.

50- **USUAL PROTECTIVE CLAUSES:** CHAMBER OF SHIPPING WAR RISKS CLAUSES TO APPLY TO THIS CHARTER PARTY, AND ALL BILLS OF LADING ISSUED UNDER THIS CHARTER PARTY, SHALL CONTAIN THE NEW JASON CLAUSE, BOTH TO BLAME COLLISION CLAUSE AND CLAUSE PARAMOUNT.

51- **EXTRA WAR RISK CLAUSE :** OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCLUDING, BUT NOT LIMITED TO, LOSS OF EARNINGS AND DETENTION, THE CREW AND THEIR PROTECTION AND INDEMNITY RISKS), AND THE GENERAL PREMIUMS AND/OR CALLS THEREFOR SHALL BE FOR THEIR ACCOUNT. WAR RISKS INSURANCE ADDITIONAL PREMIUMS, IF ANY, INCURRED AS A RESULT OF THE VESSEL ENTERING AN EXCLUDED AREA (ADDITIONAL PREMIUM) SHALL BE FOR CHARTERER'S ACCOUNT, NET OF ALL DISCOUNTS OR REBATES AND PROVIDED ALWAYS THAT CHARTERER'S ARE GIVE NOTICE OF THE AMOUNT OF SUCH ADDITIONAL PREMIUM AS SOON AS POSSIBLE AND, IN ANY EVENT, BEFORE THE VESSEL HAS ENTERED THE WAR RISK AREA AND SUCH ADDITIONAL PREMIUM IS PAID. THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED BY OWNERS FROM THEIR WAR RIKS INSURERS, UNDERWRITERS OR BROKERS SHALL BE CREDITED TO CHARTERERS IN FULL. CHARTERERS SHALL REIMBURSE OWNERS ANY AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNER'S INVOICE TOGETHER WITH FULL SUPPORTING DOCUMENTATION INCLUDING ALL ASSOCIATED DEBIT AND CREDIT NOTES. FOR THE AVOIDANCE OF ANY DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS OF PROFIT', 'LOSS OF HIRE', 'LOSS OF FREIGHT', OR 'LOSS OF BUNKER' INSURANCE TAKEN OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL PREMIUM RELATING THERETO ARISING FROM CHARTERER'S TRADING OF THE VESSEL, SHALL BE FOR OWNER'S ACCOUNT.

FOR THE PURPOSES OF THIS CLAUSE, A WAR RISK AREA WILL BE AN AREA FOR WHICH THE HULL WAR RISK UNDERWRITERS OF THE VESSEL HAVE DECLARED AN ADDITIONAL PREMIUM TO BE DUE IN ORDER FO RTHE VESSEL'S HULL & MACHINERY TO BE FULLY COVERED AGAINST THE USUAL WAR RISKS.

52- **THIRD PARTY ARREST CLAUSE :** IN THE EVENT OF ARREST OR OTHER SANCTION LEVIED AGAINST THE VESSEL OR AGAINST OWNERS OR CHARTERERS ASSETS ARISING FROM OWNERS BREACH OR ANY FAULT OF OWNERS, OWNERS SHALL HOLD CHARTERERS HARMLESS AND INDEMNIFY THEM FOR ANY/ALL DAMAGES, PENALTIES, COSTS AND CONSEQUENCES AND ANY TIME THAT VESSEL IS DELAYED AS A RESULT SHALL FALL FOR OWNERS SOLE ACCOUNT.

53- **TEXACO ITOPF CLAUSE :** OWNER WARRANTS THAT IT IS A MEMBER OF THE INTERNATIONAL TANKER OWNERS POLLUTION FEDERATION (ITOPF) AND THAT OWNER WILL RETAIN SUCH MEMBERSHIP DURING THE ENTIRE PERIOD OF THIS CHARTER. OWNER FURTHER WARRANTS THAT VESSEL SHALL, DURING THE PERIOD UNDE R THIS CHARTER, BE IN FULL COMPLIANCE WITH THE 1969 CIVIL LIABILITY CONVENTION (CLC), THE 1971 FUND CONVENTION (FUND CONVENTION) AND ALL ASSOCIATED PROTOCOLS AS UPDATED AND AMENDED AND THAT VESSEL HAS A VALID CLC CERTIFICATE ON BOARD.

54- **LAYTIME/DEMURRAGE CLAUSE :** NOTWITHSTANDING THE PROVISION OF ANY OTHER PARAGRAPH OF THIS CLAUSE, OR ANY OTHER CLAUSE OF THIS CHARTER PARTY TO THE CONTRARY, THE FOLLOWING TIME SHALL NOT COUNT AS LAYTIME OR, IF VESSEL IS ON DEMURRAGE, AS TIME ON DEMURRAGE AS PER CHARTER PARTY AGREEMENT
   A. ALL TIME BETWEEN EARLY ARRIVAL NOR AT LOAD PORT, AND 0600 (LOCAL TIME) ON THE FIRST DAY
       OF LAYDAYS OR ACTUAL COMMENCEMENT OF LAODING, WHICHEVER FIRST OCCURS, UNLESS  CHARTERERS GRANTS APPROVAL BEFOREHAND;
   B. ALL TIME SHIFTING FROM ANCHORAGE TO BERTH OR STS LIGHTERING SITE;
   C. ALL TIME SHIFTING FROM STS LIGHTERING SITE TO ANCHORAGE OR TO BERTH;
   D. ALL TIME SPENT DISCHARGING BALLAST WATER OR SLOPS, UNLESS CONCURRENT WITH CARGO OPERATIONS;

11

E.  ALL TIME SPENT WAITING CUSTOM, IMMIGRATION CLEARANCE, AND PRATIQUE;

F.  ALL TIME LOST DUE TO IMPROPER OPERATION OF THE INERT GAS SYSTEM;

G.  ALL TIME LOST DUE TO AWAITING DAYLIGHT, TIDE, FOG, TUGS OR PILOT, OR DUE TO QUARANTINE;

H.  ALL TIMEFOR BUNKERING A VESSEL, TAKING OR DISCHARGING BALLAST WATER, DISCHARGING SLOPS OR VESSEL-GENERATED WASTES, RECONFIGURING BARGES IN A TOW, CLEANING VESSEL COMPARTMENTS, UNLESS CONCURRENT WITH CARGO OPERATIONS;

I.  ALL TIME AFTER FORTY FIVE (45) MINUTES OF COMPLETION OF DISCHARGE OF CARGO, WHEREBY ALL HOSES ARE TO BE DISCONNECTED PROMPTY FROM VESSEL, UNLESS CHARTERER/SHIPPER/RECEIVER DETAINS THE VESSEL;

J.  ALL TIME SPENT FOR EXCESS BERTHING, AND EXPENSES FOR SUCH SOLELY FOR VESSEL'S PURPOSE;

K.  ALL TIME FOR DELAY FOR NON-COMPLIANCE WITH LAW AND REGULATIONS WARRANTY, AND INSURANCE COMPLIANCE.

THE PRINCIPLE OF 'ONCE ON DEMURRAGE, ALWAYS ON DEMURRAGE' SHALL NOT BE DEEMED APPLICABLE TO THIS CHARTER PARTY. ONLY TIME WHICH WOULD COUNT AS USED LAYTIME UNDER THE TERMS HEREOF PRIOR TO THE EXPIRATION OF ALLOWED LAYTIME, SHALL COUNT AS TIME ON DEMURRAGE ONCE ALLOWED LAYTIME HAS EXPIRED.

55- BIMCO ISPS CLAUSE TO APPLY TO THIS CHARTER PARTY

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

### PREAMBLE

|  |  |
|---|---|
| Place | Date |

IT IS THIS DAY AGREED between _____

chartered owner/owner (hereinafter called the "Owner") of the _____

SS/MS _____ (hereinafter called the "Vessel")

and _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A.  Description and Position of Vessel:

      Deadweight:       tons (2240 lbs.)     Classed:

      Loaded draft of Vessel on assigned summer freeboard     ft.     in. in salt water.

      Capacity for cargo:       tons (of 2240 lbs. each)     % more or less, Vessel's option.

      Coated:    ☐ Yes    ☐ No

      Coiled:    ☐ Yes    ☐ No     Last two cargoes:

      Now:     Expected Ready:

B.  Laydays:

      Commencing:     Cancelling:

C.  Loading Port(s)

      Charterer's Option

D.  Discharging Port(s):

      Charterer's Option

E.  Cargo:

      Charterer's Option

F.  Freight Rate:     per ton (of 2240 lbs. each).

G.  Freight Payable to:     at

H.   Total Laytime in Running Hours:

I.   Demurrage per day:

J.   Commission of          % is payable by Owner to

     on the actual amount freight, when and as freight is paid.

K.   The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.   Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.   Special Provisions:

       IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:                    _____

                                        By: _____

Witness the Signature of:                    _____

                                        By: _____

# PART II

**1. WARRANTY—VOYAGE—CARGO.** The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

**2. FREIGHT.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

**3. DEADFREIGHT.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

**4. NAMING LOADING AND DISCHARGE PORTS.**

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

|  | *On a voyage to a port or ports in:* |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| *Place* | *On a voyage to a port or ports in:* |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

**5. LAYDAYS.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

**6. NOTICE OF READINESS.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

**7. HOURS FOR LOADING AND DISCHARGING.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING—SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES—TAXES—WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:—any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING.

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges theron shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge—the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

Exhibit 2

16-Jul-07

## LAYTIME STATEMENT

### M/T IONIAN SEA - PALMYRA SHIPPING CP 13/06/2007  (VOY NO.7)

| LOADPORT : ALIAGA (TUPRAS TERMINAL) | | TIME | ELAPSED | COUNTED | ACCUMULATED |
|---|---|---|---|---|---|
| NOR TENDERED (18-20/06/2007 0001-1600 HRS) | 17:42 | 18-Jun-07 | | | |
| LAYTIME COMMENCED | 23:42 | 18-Jun-07 | 6.00000 | | |
| COMMENCED SHIFTING & LAYTIME SUSPENDED | 06:00 | 19-Jun-07 | 6.30000 | 6.30000 | |
| VESSEL ALL FAST & LAYTIME RESUMED | 07:42 | 19-Jun-07 | 1.70000 | | |
| HOSES DISCONNECTED | 19:10 | 20-Jun-07 | 35.46667 | 35.46667 | |
| DOCUMENTS ONBOARD & LAYTIME STOPPED | 23:30 | 20-Jun-07 | 4.33333 | 4.33333 | 46.10000  HRS |

| DISPORT : RABIGH | | TIME | ELAPSED | COUNTED | ACCUMULATED |
|---|---|---|---|---|---|
| NOR TENDERED / ANCHORED | 14:00 | 30-Jun-07 | | | |
| LAYTIME COMMENCED | 20:00 | 30-Jun-07 | 6.00000 | | |
| COMMENCED SHIFTING & LAYTIME SUSPENDED | 09:00 | 12-Jul-07 | 277.00000 | 277.00000 | |
| VESSEL ALLFAST & LAYTIME RESUMED | 11:54 | 12-Jul-07 | 2.90000 | | |
| HOSES DISCONNECTED & LAYTIME STOPPED | 19:15 | 13-Jul-07 | 31.35000 | 31.35000 | 308.35000 HRS |

| | | | |
|---|---|---|---|
| LAYTIME ACCUMULATED | = | 354.45000  HRS | |
| | | | |
| LESS:- | | | |
| 1/ LAYTIME ALLOWED | = | 84.00000  HRS | |
| 2/ DOCUMENTS ALLOWANCE AT ALIAGA | = | 3.00000  HRS | |
| 3/ CEASED DISCHARGE DUE REPLACEMENT OF O'RING AT MANIFOLD CONNECTION (12/1524 HRS TO 12/1606 HRS) 50% | = | 0.35000  HRS | |
| | | | |
| TIME ON DEMURRAGE | = | 267.10000  HRS  (   11.12917  DAYS  ) | |
| | | | |
| DAILY DEMURRAGE RATE | = | US  $35,000.00 | |
| | | | |
| GROSS DEMURRAGE | = | US $389,520.83 | |
| LESS ADDRESS COMMISSION (2.5%) | = | US    $9,738.02 | |
| NETT DEMURRAGE | = | US $379,782.81 | |

Exhibit 3

# Keenson Shipping Inc.

### 80 Broad Street Monrovia
### Liberia

**DEBIT NOTE**

MESSRS: PALMYRA SHIPPING AND CHARTERING LTD

DATE  : 16 JUL 2007

NAME OF VESSEL / VOYAGE:  IONIAN SEA / VOY 7

D/N NO : 1208/TPMS/V/7/2

RE: IONIAN SEA / PALMYRA - CP DATED 13/06/2007

| DESCRIPTION | DEBIT | CREDIT |
|---|---|---|
| **Demurrage**<br>11.12917 DAYS DEMURRAGE AT CHARTER PARTY RATE OF USD 35,000.00 PER DAY PRO RATA | 389,520.83 | |
| **Address Commission**<br>Usd        389,520.83 x        2.5000        Percent | | 9,738.02 |
| | 389,520.83 | 9,738.02 |
| IN WORDS: UNITED STATES DOLLARS:-<br>THREE HUNDRED SEVENTY-NINE THOUSAND SEVEN HUNDRED EIGHTY-TWO AND EIGHTY-ONE CENTS  ONLY.<br><br>PAYABLE IN U.S. DOLLARS BY TELEGRAPHIC TRANSFER:-<br>TO : HONGKONG SHANGHAI BANKING CORP., USA<br>452 FIFTH AVENUE NEW YORK, NY 10018, USA<br>SWIFT : MRMDUS33, CHIPS: 108<br>ABA NO. 021001088<br>IN FAVOUR OF : TATIANA MARITIME INC.,<br>A/C NO. 000135275<br><br>WITH MESSAGE : IONIAN SEA / PALMYRA CP DATED 13/06/2007<br>            - DEMURRAGE | | |
| **AMOUNT DUE TO OWNERS:  USD** | 379,782.81 | |

E. & O. E.

AS MANAGER

# Keenson Shipping Inc.

**80 Broad Street Monrovia**
**Liberia**

DEBIT NOTE

MESSRS: PALMYRA SHIPPING AND CHARTERING LTD

DATE   : 01 AUG 2007

NAME OF VESSEL / VOYAGE:  IONIAN SEA / VOY 7

D/N NO : 1208/TPMS/V/7/3

RE: IONIAN SEA / PALMYRA - CP DATED 13/06/2007

| DESCRIPTION | DEBIT | CREDIT |
|---|---|---|
| **Additional War Risk Premium** | | |
| Being call at Rabigh, 30/06-13/07/2007 | 8,775.00 | |
| Less 12.5% No Claims Discount | | 1,096.88 |
| | 8,775.00 | 1,096.88 |
| IN WORDS: UNITED STATES DOLLARS:- | | |
| SEVEN THOUSAND SIX HUNDRED SEVENTY-EIGHT AND TWELVE | | |
| CENTS  ONLY. | | |
| | | |
| PAYABLE IN U.S. DOLLARS BY TELEGRAPHIC TRANSFER:- | | |
| TO : HONGKONG SHANGHAI BANKING CORP., USA | | |
| 452 FIFTH AVENUE NEW YORK, NY 10018, USA | | |
| SWIFT : MRMDUS33, CHIPS: 108 | | |
| ABA NO. 021001088 | | |
| IN FAVOUR OF : TATIANA MARITIME INC., | | |
| A/C NO. 000135275 | | |
| | | |
| WITH MESSAGE: IONIAN SEA / PALMYRA CP DATED 13/06/2007 | | |
| AMOUNT DUE TO OWNERS:  USD | 7,678.12 | |

E. & O. E.

AS MANAGER